Case 1:11-cv-02318-JEJ-SF   Document 44   Filed 08/30/12   Page 7 of 66

THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JAMES A. Lucas, plaintiff,                    :        Civil No: 1:11-cv-2318

v.                                            :        (Jones, J.)

BA BLEDSOE, et al., defendants.               :        AMENDED COMPLAINT

## AMENDED COMPLAINT

Pro-Se Plaintiff files this Amended complaint pursuant to Fed. R. Civ. P. 15(a) and 15(c), to properly identify parties. Thus, paragraphs # 268 an # 306 which refer to John Doe Defendants # 5 — #11 are amended to reflect the true identities of Defendants #5 C. Anderson, #6 R. Seagraves, #7 K. Yahia, #8 M. Kline, #9 B. Gaston, #10 C. Trautz, and #11 M. Torrez. They are sued in their individual capacities.

## INTRODUCTION

① This is a civil rights action filed by Plaintiff, James A. Lucas, pursuant to Bivens v. Six Unknown Named Agents of the Bureau of Narcotics, 403 U.S. 388 (1971), for the violation of Plaintiff's right to be free of excessive use of force an misuse of force, and his right to adequate medical care, as guaranteed and protected by the Eighth Amendment of the Constitution of the United States.

② At all times relevant to this action, Plaintiff was a prisoner at the United States Penitentiary held at Lewisburg, Pennsylvania.

③ Defendants, individually and collectively, deprived Plaintiff of his federally guaranteed rights by subjecting him to excessive use of force an misuse of force, and by denying him adequate medical care.

④ All allegations of this Complaint are based on Plaintiff's belief, information, an facts currently available to him. Further discovery is needed to determine, among other things, all individuals involved, and the full extent of each defendants', and other individuals' actions or omissions that deprived Plaintiff of his rights.

- 1 -

1 (A)

## DEFENDANTS (59 Total)

| | |
|---|---|
| S. McFadden, Lieutenant | S. Both, c/o |
| A. Sassman, Lieutenant | G. Wise, c/o |
| Scampone, Lieutenant | Z. Edinger, c/o |
| P. Carvagille, Lieutenant | M. Keebes, Treatment Specialist |
| J. Johnson, Lieutenant | H. Birdsell, Treatment Specialist |
| M. Saylors, Lieutenant | S. Tigo, c/o |
| John Doe #4, Lieutenant | K. Admire, Unit Manager |
| S. Seeba, Lieutenant | M. Jones, Chaplain |
| C. Mattingly, Lieutenant | C. Anderson, c/o |
| A. Galletta, Lieutenant | K. Seagrares, c/o |
| John Doe #1, c/o (Correctional Officer) | K. Yatrio, Recreation Specialist |
| John Doe #2, c/o | M. Kline, c/o |
| John Doe #3, c/o | B. Gaston, c/o |
| Haney, c/o | C. Krantz, c/o |
| Drick, c/o | M. Jarrow, c/o |
| Tanner, c/o | B. Packer, c/o |
| E. Kilpatrick, c/o | J. Bradoe, c/o |
| B. West, c/o | J. Hooper, Lieutenant |
| G. Edinger, c/o | Health Services |
| E. Good, c/o | S. Brown, (H.S.A.) Health Services Adminum |
| S. Hicks, c/o | D. Dehean, J.D.C., RN |
| E. Winebetter, c/o | W. Brennaman, RN |
| M. Wagner, c/o | B. Walls, EMT |
| C. Webb, c/o | B. Prince, EMT |
| S. Potzmann, c/o | C. George, EMT |
| K. Whittaker, c/o | L. Potter, EMT |
| S. Treska, c/o | M. Pearia, PA |
| K. Loss, c/o | J. Lasarro, MLP |
| E. Stuart, Lieutenant | J. Hama, MLP |
| | J. Hemphill, PA |

## JURISDICTION

⑤ This Court has ~~had~~ jurisdiction Under 28 U.S.C. 1331 because this action arises Under the Constitution an laws of the United States.

⑥ Venue lives in the ~~Western~~ middle District of Pennsylvania Under 28 U.S.C. 1391 because all of the acts an omissions giving rise to this Compliant occurred in this District.

## PARTIES

⑦ Plaintiff is an adult individual who at all times relevant Was ~~incarcerated~~ incarcerated at the United States Penitentiary Lewisburg, Pennsylvania.

⑦ All Defendants are adult individuals who at all times relevant to this action Were employees at United States Penitentiary Lewisburg, Pennsylvania.

⑨ Defendants, B.A. Bledsoe, and S. Brown are all sued in their Official and individual capacities.

⑩ All other Defendants are sued in their individual capacities.

⑪ Each of the defendants, at all times relevant to the allegations of this Compliant, Was acting, and continue to act Under color of Federal Law.

## FACTS

⑫ On 2/25/10, at or around 1 pm, While about to be escorted to recreation, Officer Shearns Lost-ered escorted Plaintiff to the shower area, secured Plaintiff in shower stall and ordered him to submit to a visual search.

⑬ Plaintiff calmly refused an requested for a lieutenant to know the reason Why.

⑭ Defendant Shearns came and told Plaintiff that a visual search can be done at random.

- 2 -

and asked was Plaintiff going to submit to a visual search. And Plaintiff calmly an simply replied," No."

⑮ Defendant Stuart stated," I will get the Use of Force Team an put you in restraints."

⑯ Defendant Stuart ordered Officer Shears to keep close observation on Plaintiff.

⑰ Defendant Stuart got authorization from Defendant Bledsoe to assemble a Calculated Use of Force Team to force Plaintiff to submit to a visual search and to place Plaintiff in hand ambulatory restraints.

⑱ For about an hour an ten minutes, Plaintiff and Officer Shears had normal conversation about different an numerous topics.

⑲ At about 2:20pm, Defendant Stuart arrived with, an led, the Use of Force Team.

⑳ The Calculated Use of Force Team consisted of Defendants: Officers, Kilpatrick, West, Edinger, Good, Hicks, Klinefelter, Treatment Specialist Freeles, And Health Services Deleon.

㉑ Treatment Specialist Freeles, (Confrontational Avoidance Staff), asked Plaintiff if he could submit to a visual search.

㉒ Plaintiff replied, "Yes", And calmly submitted to handrestraints an complied an cooperated with a visual search.

㉓ After Calculated Use of Force Team completed visual search, Plaintiff was placed in underwear, socks, an a T-shirt. And then placed in hard ambulatory restraints (ie. leg shackles, handrestraints (straight handcuffs) that are connected to a bellych- ain (martin chain)in front.

(24) This placement of hand and ambulatory restraints was done despite the fact that Plaintiff complied and submitted to the visual search.

(25) The Calculated Use of Force Team Members callously and knowingly applied the belly-chain and handrestraints unnecessarily extremely too-tight.

(26) The handrestraints and bellychain was so tight that the handrestraints could not move at all along Plaintiff's ████ left wrist, and the right handrestraint on his right wrist would move only when forced. The bellychain would not move at all along or about Plaintiff's waist and threatened to pull handrestraints of forearms.

(27) This extreme tightness of handrestraints and bellychain caused Plaintiff immediate pain. Plaintiff immediately made this known by calling Defendant Short and telling him that the restraints was extremely too-tight and causing in unnecessary pain.

(28) Defendant Short only replied, "I'll check them when they are finish", as Plaintiff continuously told him throughout the application that the restraints was being applied extremely too-tight and caused pain.

(29) The Calculated Use of Force Team Camera Operator was not able to visually record the knowing callousness of which the Calculated Use of Force Team Members intentionally applied the restraints with extreme tightness.

(30) After the Calculated Use of Force Team applied the restraints they turned Plaintiff around for Defendant Short to check them.

(31) Plaintiff continued to tell, and displayed to Defendant Short that the handrestraints and bellychain was extremely and unnecessarily too-tight and causing intense pain.

(32) Defendant Stuart touched the handrestraints and did nothing at all about the fact that the handrestraints or the bellychain would not move and causing Plaintiff intense pain.

(33) Defendant Stuart ~~~~~~~~~~ provided a false statement of : "The restraints are alright", for the audio of the Calculated Use of Force Camera which was still not able to record visably the actual actions or facts.

(34) Defendant Delcon (Health Services) then stepped by to Plaintiff and grabbed the handrestraints. Defendant Delcon did nothing at all about Plaintiff's statements or physical evidence that the handrestraints or bellychain was extremely unneccessarily too tight and causing ~~~~~~ intense pain.

(35) Defendant Delcon also provided the ~~~~ false statement of : "Restraints don't interfor with circulation", in corroboration with Defendant Stuart.

(36) The Calculated Use of Force Camera was at ~~~ no time in the proper position to actually record the up close step by step actions of application of restraints, nor in a proper position to record the up close visual of restraints on Plaintiff after application.

(37) Defendant Delcon did not perform any examination of Plaintiff. Nor did he do a vital signs check.

(38) Defendant Delcon was only in Plaintiff's presence long enough for him to touch ~~~ the handrestraints or prefabricate for audio of Calculated Use of Force Camera.

(39) Plaintiff did not at any time resist or display threatening, aggressive behavior and only allowed his entire body to go limp.

(40) Defendant Stuart ordered the ~~~ Calculated Use of Force Team to carry Plaintiff

to Health Services to x-ray his stomach.

41. Plaintiff continued to remain limp after x-ray and the Calculated Use of Force Team carried him to Z-Unit to a restraint cell.

42. The Use of Force Team laid Plaintiff down on his back on a mattress an began to back out of cell.

43. No Use of Force Team Member was near Plaintiff as he started to roll over on his side in order to be able to sit-up.

44. As Plaintiff finally sat halfway up, Defendant Short began yelling, without warning or justification, "Stop resisting! Stop resisting!".

45. No order had been issued for Plaintiff to resist, but at Defendant Short's yell of "Stop resisting", he and the entire Use of Force Team rushed back in cell and tackled Plaintiff on the bed.

46. Plaintiff was only halfway sitting up when this was done.

47. The entire Use of Force Team was on top of Plaintiff, suffocating and holding him. And every Use of Force Team Member was grabbing different limbs of Plaintiff's body; hands, fingers, feet, head, and twisted, turned, and/or pulled them in different ways an angles sending excruciating racking pain throughout his entire body.

48. Plaintiff continued to yell, "I'm not resisting anything", as Defendant Short kept yelling, "Stop resisting!".

49. Plaintiff was still in hand ambulatory restraints that was unnecessarily too tight an painful.

50 Defendant Stewart finally ordered the Use of Force Team to pick Plaintiff up and stand him in the corner of room.

51 The Use of Force Team did so, and Defendant Stewart gave Plaintiff an order to ~~stan~~ stay in the corner until the Use of Force Team exit the cell.

52 Defendant Stewart ordered the Use of Force Team to "Get him if he moves" (or something along those lines). Plaintiff obeyed order and did not move from ~~corner.~~ corner.

53 Defendant Stewart an Calculated Use of Force Team left the cell.

54 For the first three hours, Plaintiff was not seen by a Lieutenant.

55 Plaintiff complained and displayed to Z-Unit Staff that the handrestraints and belly-chain was unnecessarily too-tight an causing extreme pain, and that his wrists and forearms were swelling [Only one Z-Unit's Staff Member's name is recalled. The others are John Does ~~____~~ #1, #2, #3 ]

56 At different, but numerous times, a Z-Unit Staff Member would respond; "What do you Want?", when Plaintiff called them to cell door an displayed an told them the restraints was too-tight an causing intense pain, bitting into his skin, and that his wrists and forearms was swollen.

57 The Z-Unit Staff, every time Plaintiff stopped one, would reply, "What do you want me to do?", When Plaintiff told them, "I need to see a Lieutenant or Medical". They would only state "If you stay", and walk away.

58 At one time, Plaintiff stopped Z-Unit Staff, Defendant Harvey, and requested for a Lieutenant or Medical as he displayed his swollen an painful wrists an forearms.

(59) Defendant Harney told Plaintiff, "You know, you was a tough guy to refuse a strip search, but now you want to cry in restraints". And walk away.

(60) At another time, Plaintiff stopped and again pleaded to a Z-Unit staff to call a lieutenant or Medical an was told, "Yeah, Yeah, so what? The restraints are too-tight. I'm not going to drag the lieutenant up here", and walked away.

(61) This type of dialogue between Plaintiff an Z-Unit staff went on an ocurred every 15 minutes for about 3 hrs. No lieutenant or Medical was called.

(62) As time went on the swelling and inflammation of Plaintiff's wrists and forearms got worse and worse. Plaintiff felt painful live an throbing sensations throughout his left hand, wrist, an fingers whenever he moved them. And a painful numbness in both wrists an forearms when he did not move them.

(63) The restraints was so tight that they did not allow the movement needed to use the bathroom or eat.

(64) At one time during the latter part of this three hour period, Plaintiff observed Counselor Metzger, Defendant Sassman an other staff escort another prisoner, who was also in hard ambulatory restraints; to the cell directly across from Plaintiff.

(65) Plaintiff persistently called for Defendant Sassman but was only ignored.

(66) At about 5pm or 6pm, Defendants Hooper and Sassman finally came to do a restraints check and Plaintiff immediately showed them the visible too-tight restraints and told them that they were too-tight and causing extreme pain.

(67) Plaintiff's swollen, inflamed, an bruised wrists an forearms was clearly visible as he told them that they won't allow him the movement necessary to eat an (urinate) use bathroom.

And pleaded for restraints to be loosened.

68) Defendant Sassaman stayed silent, did not intervene and only gave Plaintiff a copy of an Incident Report.

69) Defendant Hooper responded to Plaintiff's pleas with a smarting, "What do you expect?".

70) Plaintiff again told him that the restraints are extremely too-tight and causing intense pain. Plaintiff again displayed the clear obvious injuries, on that the restraints would not make on Plaintiff's wrists, forearms, on wrist.

71) Defendant Hooper only replied, "So?" Defendant Sassaman did not respond.

72) As this occured, Z-Unit staff and Health Services Defendants; Brennaman and Walls was standing at cell door.

73) Defendant Brennaman was standing in doorway (door open) of cell, looking in cell with Defendant Walls ~~looking~~ behind him.

74) This was suppose to be the first Medical Restraint check but neither Defendant Brennaman nor Defendant Walls even came in cell.

75) Neither Defendants; Hooper nor Sassaman; loosened the extremely too-tight restraints. Nor did they attempt to do anything about the clear obvious injuries Plaintiff had on intense pain he was in.

76) On the next two hour check, Defendants Hooper and Sassaman came inside cell. And Plaintiff again displayed the too-tight restraints; his swollen, inflammed, bruised wrists and forearms. And pleaded for them to be loosened.

(77) Defendant Hooper grabbed the handrestraints and attempted to force them along Plaintiff's swollen wrists. This caused Plaintiff excruciating intense pain throughout his wrists, hands, forearms, and waist.

(78) The right cuff of handrestraint barely moved on Plaintiff's right wrist. And the left cuff on his left wrist did not move at all.

(79) Despite the clearly visible injuries on that restraints caused not made and the intense pain they caused Plaintiff, Defendants Hooper an Sassman did nothing

(80) Defendant Hooper only stated, "They okay".

(81) Plaintiff again pleaded for Defendant Hooper to loosen restraints because of the injuries on excruciating pain they caused. And that they would not allow him the movement to eat or use the bathroom.

(82) Defendant Hooper looked at Plaintiff and replied, "See, what you fail to realize is that: I don't care".

(83) At this time Defendant Sassman, began to walk to door.

(84) Plaintiff told Defendant Hooper, "The restraints are not suppose to be tight like this an cause pain an swelling".

(85) Defendant Hooper sarcastically stated, "Yeah, I know, Cruel an Unusual Punishment and all". The he and Defendant Sassman walked out of cell.

(86) As Plaintiff started to lay back down in pain, Defendant Hooper came back to cell door and asked, "You want to come out of those restraints?"

(87) Plaintiff responded, "Yes", And Defendant Hooper responded by bursting out laughing, then walked away from door.

(88) At around 10pm, Defendants Hooper an Sassman, along with Health Services Defendant Walls came to do restraints check.

(89) Defendant Hooper asked Plaintiff, "Do you want Medical to check you?" And Plaintiff replied, "Yes." an painfully sat up.

(90) Defendant Walls then grabbed Plaintiff's handrestraints an tried to move them as he looked at the tightness of them and the extreme swelling, inflammation an bruising of Plaintiff's wrists an forearms.

(91) Plaintiff winced in pain at Defendant Walls' every touch of his wrists, hands, an forearms.

(92) Defendant Walls turned to Defendant Hooper and stated, "Boss, we have to calm down some." And Defendant Hooper looked disappointed, then stated "All-right".

(93) Defendants Hooper an Sassman finally loosened the handrestraints, ~~~~ Nevertheless, Plaintiff only recieved minimal relief because his wrists an forearms were so ~~~~ swollen an inflammed.

(94) The ~~~~ handrestraints was only ~~~~ loosened enough where they would move then forced along Plaintiff's wrists.

(95) No other part of restraints was checked, although Plaintiff told an showed the Defendants that the bellychain would not move around wrists, & was biting into his skin, pulled handrestraints up forearm and caused intense pain.

(96) Defendant Walls did not give Plaintiff any pain medication, nor did he treat Plaintiff's injuries of extreme swelling, inflammation an deep bruises on an along his wrists an forearms

that was easily seen on visible. Nor did Defendant Walk perform a vital signs check.

97) Defendants: Hooper, Sassman, and Walks left the cell.

98) At 12 am 2/26/10, shift changed, and Defendant McFadden came to do restraints check.

99) Defendant McFadden did not check Plaintiff's bellychain nor leg shackles and only grabbed Plaintiff's handrestraints, eventhough Plaintiff told him that the bellychain was too tight an causing pain an pulling handrestraints up forearm.

100) Defendant McFadden did not attempt to get Plaintiff any medical attention for his extremely swollen inflamed bruised wrists an forearms.

101) The restraints check went the same during McFadden's shift.

102) On 2/26/10 at around maybe 8 am, Defendant Scampone came and did restraints check and did not loosen the bellychain.

103) A little while after Defendant Scampone left, Health Services: Defendant Prince came and checked Plaintiff. And performed a blood pressure an temperature (vital signs) check on Plaintiff.

104) This was the first actual vital signs check that had been performed on Plaintiff since he began in hand ambulatory restraints.

105) Defendant Prince did not attempt to treat or record Plaintiff's clearly visible deep bruises an abrasion on Plaintiff's swollen inflamed wrists an forearms. Nor did she check any part of restraints even after Plaintiff told her that the bellychain was too tight and causing pain.

(106) Defendant Prince left cell after she performed the vital signs check.

(107) A little while after Defendant Prince left, Health Services Defendant Peoria came and performed a vitals signs check on Plaintiff.

(108) Defendant Peoria did not check restraints, eventhough Plaintiff complained and showed him that they were too-tight and causing pain and injuries.

(109) Defendant Peoria refused to treat or record Plaintiff's clearly visible swollen, inflammed bruised and abrasioned wrists and forearms. And left cell after he performed vital signs check.

(110) At around 10 am 2/26/10, Defendant Scampone came to do his second restraints check and in the process he finally released Plaintiff from hard ambulatory restraints, and escorted him to his cell in D-Unit.

(111) Defendant Scampone did not order any medical care or treatment for Plaintiff's plainly visible extremely swollen inflammed wrists and forearms which was riddled with visible abrisido deep bruises and abrasions.

(112) During active time of the above events Plaintiff display aggressive or belligerant behavior. Nor was he a threat to himself or others.

(113) Plaintiff did submit and comply, and to a visual search when asked to do so by Treatment Specialist Knerles (Confrontational Avoidance Staff).

(114) There was not a real justifiable penological reason for Plaintiff to have been placed in and left in hard ambulatory restraints for a prolonged period of 20 hrs.

(115) The hard ambulatory restraints was porposefully and intentionally applied extremely too-tight by Calculated Use of Force Team.

- 13 -

(116) The extremely too-tight hard ambulatory restraints caused physical injuries to Plaintiff's wrists, forearms, and waist.

(117) On 2/27/10, at around 7am, Plaintiff made a request to D-Unit Officer to see Health Services to treat, assess, an record the injuries of wrists, forearms, an waist caused by the hand ambulatory restraints.

(118) At around 7:22 am the Officer reported to Plaintiff that Health Services Defendant Prince, told her to tell Plaintiff that he should wait until Monday (almost a total of 49 hrs in the future) and talk to the Physician Assistant at D-Unit.

(119) Plaintiff then requested to speak to a lieutenant, And Defendant Scampone was notified, an came to speak with Plaintiff.

(120) Plaintiff renewed his request for a Medical Assessment an treatment as he displayed his clearly visible, then mildly swollen an inflammed, deeply bruised, an abrasioned wrists and forearms an waist.

(121) Defendant Scampone stated, "I will contact Ms. Prince."

(122) At around 9:30 am Health Services Defendant Potter made "Pill line" rounds, and Plaintiff told him and showed him his injuries an pain, and asked for them to be assessed, treated, an recorded.

(123) Defendant Potter already knew of Plaintiff's request and only took a casual look through cell window ofor Plaintiff's deeply bruised an abrasioned and mildly swollen an inflammed forearms an wrists and stated, "It's nothing but scratches, you should stay out of restraints."

(124) Plaintiff told Defendant Potter that his injuries is more than "just mere scratches and

-14-

that he was in pain, and again requested for an assessment, treatment on that his actual injuries be properly recorded.

(125) Defendant Potter sarcastically told Plaintiff, "I will mark down an make a note that you have small scratches". Defendant Potter did not attempt to perform an actual examination of Plaintiff an only downplayed the obvious ~~the~~ visible injuries. Nor did he treat injuries.

(126) ~~Defendant Potter~~ For the rest of the shift Plaintiff persistently an continuously requested for an actual medical assessment an ~~treatment~~ for injuries on wrists, forearms, and waist. Plaintiffs requests was ignored.

(127) Plaintiff continued to feel a painful tingling, burning sensation in his left wrist whenever he would apply any pressure while bending his wrist back or forward and during any usepand medicated himself with OTC° (Bayer, an Aspirin) for the months of March an April.

(128) This injury of left wrist an hand did not get better an ~~better med~~ Plaintiff seeked medical attention by submitting a formal sick call slip personally to Health Services Defendant Navarro on May 3, 2010.

(129) Defendant Navarro was assigned M.L.P. (~~Medical Licensed~~ Medical Licensed Practicioner) for D-Unit at this time, an Plaintiff clearly explained his pain, symptoms, an the cause of injuries.

(130) Plaintiff was never examined by Defendant Navarro eventhough he prescribed him Naproxen.

(131) On 5/14/10 Plaintiff again gave ~~to~~ Defendant Navarro another cop-out complaining of pain, ~~explaining~~ explaining the symptoms, its causation. And that prescribed medication was not helping.

(132) After Plaintiff's numerous sickcall slips, cop-outs, an verbal complaints of pain an injury, he was given an x-ray on 5/19/10. And during x-ray Plaintiff found out that Defendant Navarro had ordered the x-ray for Arthralgias of both hands; instead of actual causation of injury.

(133) Plaintiff submitted a cop-out to Defendant Navarro requesting to know the x-ray results and was verbally told by Defendant Navarro, "The x-ray is good, negative findings. You only have tendonitis."

(134) Plaintiff again told Defendant Navarro that the pain medication was not helping with pain and Defendant Navarro prescribed him a different medication, called Meloxicam. Plaintiff was never examined.

(135) Plaintiff recieved a copy of his Medical Records and after review Plaintiff seen that Defendant Navarro did not place or mention any of Plaintiff's numerous sick-call slips, cop-outs etc, concerning and explaining the symptoms, pain, an causation of injury of left wrist (i.e extremely too-tight hand ambulatory restraints on 2/25/10 – 2/26/10).

(136) On 6/25/10, Plaintiff submitted a cop-out to Defendant Navarro requesting to know why he omitted all Plaintiff's cop-outs an sick-call slips concerning this injury of wrist in his Medical Records and recorded instead that the false information that Plaintiff suffers from an have a history of arthralgias, and unspecified monoarthritis, but continues to tell Plaintiff verbally that he has Tendonitis in his wrist.

(137) Plaintiff did not recieve a response from cop-out.

(138) On 6/30/10, Plaintiff verbally inquired again of Defendant Navarro why he misrepresents an falsify information concerning injury of left wrist and Defendant Navarro told Plaintiff that he does suffers from Tendonitis an that he will change an ████████████ correct his Medical Records.

(139) After a review of an up-to-date copy of his Medical Records, Plaintiff seen that ~~Defendant~~ Defendant Navarro still continuously record "history of joint issues" and states nothing of actual symptoms, pain, or causation of Plaintiff's injury of left wrist.

(140) On 7/16/10, Plaintiff verbally requested of ~~the~~ Defendant Navarro, why he continues to knowingly omit actual facts and record false information concerning Plaintiff's injury of left wrist.

(141) Defendant Navarro stated "I know what you want but will not give it to you. Have a nice day." And walked away.

(142) Plaintiff to this day does not know the full extent of, nor exactly what his injury of left wrist is, nor has he received adequate or appropriate medical care or treatment.

(143) Plaintiff had not been able to fully use his left wrist and hand without feeling painful tingling burning sensations whenever pressure is applied.

(144) Plaintiff has never been examined concerning this injury an has only been prescribed different pain medications that has not really helped.

(145) On 8/2/10 around 11:02 am, due to falsified information and documentation from ~~the~~ Defendant Brozbe, Defendant Carrasquillo got authorization from Defendant Bledsoe to assemble a Calculated Use of Force Team to place Plaintiff (on cellmate) in hard ambulatory restraints for a prolonged period of time.

(146) At about 12:40pm, the Calculated Use of Force Team, lead by Defendant Carrasquillo, arrived at Plaintiff's (on cellmate) door.

(147) ~~The~~ The Calculated Use of Force Team in total consisted of Defendants: Officers: Webb, Wagner, Potzman, Whittaker, Wesno, Ross, Booth, Wise, Eslinger, and Treatment Specialist

-18- -17-

Birdsall (as Constitutional Avoidance).

(148) Defendant Birdsall (Constitutional Avoidance) asked Plaintiff (an cellmate) to submit to handrestraints. Both Plaintiff (and cellmate) complied and did submitted to handrestraints as was escorted by Use of Force Team out of cell.

(149) The Calculated Use of Force Team escorted Plaintiff into shower area where he was visually searched, clothed in boxers, t-shirt, an socks, then hand ambulatory restraints was applied.

(150) The Calculated Use of Force Team ~~did submit~~ purposefully misapplied the handrestraints by applying them on Plaintiff's upper forearms instead of wrists. And purposefully misapplied the bellychain by applying ~~them~~ around ~~the~~ Plaintiff's chest instead of waist.

(151) The bellychain was pulled around Plaintiff's chest until it was impossible for it to be pulled anymore. And the handrestraints were ~~submit to~~ applied so tight that they could not move at all on Plaintiff's forearms. Both caused Plaintiff immediate pain.

(152) After the Use of Force Team finished misapplying and applying too-tightly the restraints, Plaintiff was turned around for Defendant Carrasquillo to check them.

(153) Defendant Carrasquillo seen the clear obvious misapplication an tightness of handrestraints and bellychain and did nothing to correct an fix it. And instead state falsely for ~~the the~~ benefit of audio of Use of Force Camera, "Restraints are alright".

(154) The Use of Force Camera was not in the position to record the misapplication an tightness of restraints.

(155) Health Services Defendant Potter came behind Defendant Carrasquillo to check restraints, and also seen the visible obvious misapplication an ~~the~~ extreme tightness of handre-

-straints and did nothing to correct or fix them, And also provided a false statement for audio of camera that " restraints do not interfere with circulation".

(156) As the Use of Force Team applied the restraints on his cellmate, Plaintiff was in intense pain from the misapplied, extremely too-tight handrestraints an bellychain an contiuodoly co-lled Defendant Carrasqillo telling him that the restraints are too-tight an causing intense pain.

(157) Plaintiff was never acknowledged by Defendant Carrasqillo eventhough he was less than six feet away an contiuodoly called an told him.

(158) Plaintiff (an cellmate) was placed in cell 202 on the second floor of D-Unit, After the hand ambolatory restraints was applied. Then the Calculated Use of Force Team left.

(159) Plaintiff immediately an easily seen that his cellmate's handrestraints an bellychain was also misapplied, applied extremely too-tight and was causing him pain as well.

(160) Plaintiff's (an cellmate's) forearms and wrists immediately started swelling and was hurting. And Plaintiff also had to lay, sit, an sleep on the floor with mattress because he was unable to get on top bunk with restraints.

(161) Plaintiff told an showed the easily seen too-tight an misapplied restraints, the pain an swelling they caused to both Defendants; Tanner and Drich; at numerous times an occasions, yet, they did nothing but taunt or ignore him.

(162) Defendants Drich an Tanner was D-Unit staff Members.

(163) At around 1:09 pm, Plaintiff (an cellmate) was given lunch trays but was not able to eat because the misapplied, too-tight restraints would not allow the mo-vements necessary to perform this act and had caused their wrists an forearms

-19-

to swell an ~~inflame~~ inflame with intense pain.

(164) Plaintiff (an cellmate) also could not maneuver to use the bathroom (urinate) because of the misapplied, an too-tight restraints.

(165) Plaintiff told Defendants; Drick an Tanner; as well as Defendan Saylors when he came to do the restraints check at around 2:01pm, that the tasks of eating, ~~sleep~~, and using the bathroom could not be performed due to the extremely too-tight, an misapplied restraints.

(166) Plaintiff (an cellmate) also ~~could be~~ displayed their easily seen swollen an inflammed wrists an forearms, And told him about the extreme pain that the restraints caused.

(167) Defendant Saylors stated; "The restraints will remain tight Subt each Lieutenant make a decision on to loosen them or not". And grabbed the Introduced food trays and walked out cell.

(168) Defendant Bradoe stood in doorway of cell and laughed throughout the whole exchange.

(169) At about 2:30pm, Health Services Defendant Potter did "Pill Line" rounds, and asked Plaintiff was he going to take his medicine. Plaintiff displayed his swollen forearms an wrists an told Defendant Potter that he was in excruciating pain an ~~andt~~ that the misapplied, an too-tight restraints won't allow the movement necessary to take medicine or drink water.

(170) Defendant Potter stated; "I can't do anything about it, that's how we do them here". And walked away.

(171) At around 3:45pm, Defendant Johnson did restraints check, and Plaintiff (and cellmate) showed an told him that the restraints was misapplied an too tight, causing intense pain, and would not allow the movement needed to eat, or use the bathroom.

(172) Plaintiff's (an cellmate's) extremely swollen an inflammed forearms an wrists, and that the hand restraints would not move along or span forearms, wrists, an wrists at all and was bitting in to skin an causing deep bruises an abrasions was easily an clearly seen.

(173) Defendant Johnson only stated, "I will let Medical check restraints", as Plaintiff (an cellmate) pleaded for him to loosen restraints.

(174) Defendant Johnson did nothing but to do the handrestraints, then he an the other 2 so officers left cell.

(175) At around 4pm, Plaintiff's cellmate went to door and called Officer Ross (D-Unit staff) an displayed his extremely swollen an inflammed wrists an forearms and Officer Ross replied, "Yeah that's swollen real good".

(176) Plaintiff also displayed his extremely swollen, inflammed, bruised wrists an forearms. And Plaintiff (an cellmate) pleaded for him to call Medical. An Officer Ross stated that he would.

(177) Plaintiff started to feel his right forearms, wrist, and hand go numb.

(178) At around 4:45pm, Officer Ross fed dinner but held Plaintiff (an cellmate's) food trays because the too tight, misapplied restraints would not allow the movement necessary to eat.

(179) Officer Ross stated, "Medical was suppose to have been here. I will get your trays so

until they come". And, "I will give them another call".

(190) At around 6pm, Defendant Johnson and Health Services Defendant Brennaman came to do restraints check.

(191) Defendant Brennaman checked Plaintiff's cellmate's hand restraints first, and after seeing his extremely swollen forearms and wrists, immediately told Defendant Johnson that the hand restraints need loosening. And Defendant Johnson finally proceeded to loosen Plaintiff's cellmate's restraints.

(192) Plaintiff observed that after cellmate's hand restraints was open Defendant Johnson had to pull them off of deep indentions and bruises that they had caused in skin of flesh of forearms and wrists.

(193) Defendant Brennaman then came to Plaintiff to check his restraints. Plaintiff was sitting on his mattress on the floor and ~~and in the~~ because the cell contains bunk beds and it was impossible to get up and down on top bunk safely while in ambulatory restraints.

(194) Prisoners when placed in hard ambulatory restraints here at SCP Lewisburg are forced two to a cell which only contains double bunk beds which forces someone to sleep on floor.

(195) Defendant Brennaman immediately saw the immense and extreme swelling and inflammation of Plaintiff's forearms and wrists, especially the right forearm and wrist, and told Defendant Johnson to loosen Plaintiff's right hand restraint.

(196) Defendant Johnson came over to loosen Plaintiff's right hand restraint and Plaintiff (and cellmate) showed and told Defendant Brennaman that the belly chain was misapplied, too tight, ~~and~~ could not move^and was biting into the skin and causing extreme pain.

(187) Plaintiff also showed Defendant ~~Johnson~~ Brennaman that the bellychain pulled on forced handrestraints by forearms, and ~~he~~ he did nothing but state "My job is only part of the restraints that can restrict circulation, and the bellychain does not so I leave it up to the lieutenants".

(188) Defendants' Johnson an Brennaman both refused to loosen the too-tight misapplied bellychains.

(189) Defendant Johnson refused to loosen Plaintiff's left handrestraint because Defendant Brennaman told him, "No", eventhough it would not make at all on Plaintiffs swollen wrist.

(190) ~~Plaintiff~~ Defendant Brennaman refused to give Plaintiff something for the extreme pain ~~back and front~~ and dullness when he asked. Nor did Defendant Brennaman treat or record the obvious clear bruises swelling etc of Plaintiffs (an cellmates) wrists forearms and wrists.

(191) Defendant Brennaman did not perform a vital signs check on Plaintiff (or cellmate). And Defendants Brennaman an Johnson left cells without checking any other parts of restraints.

(192) The handrestraints was only loosened enough where Plaintiff (an cellmate) could finally perform duties as eating or drinking, although ~~both~~ with much difficulty. And ~~the~~ (Correctional Officer) C/o Fross brought the food trays. Restraints was still extremely too-tight.

(193) At around 8pm Defendant ~~to~~ Johnson, along with Health Services Defendants Brennaman and Potter did restraints check. Defendant Johnson only toldd the handrestraints.

(194) As Defendant Brennaman moved to cellmate, Defendant Potter touched Plaintiff's

handrestraints and Plaintiff told him that his forearms on wrists and both sides hurt.

(195) Plaintiff told Defendant Potter that his right forearm, wrist, an fingers of hand was painfully swollen an asked for something for pain. Defendant Potter easily seen Plaintiff's swollen inflammed bruised wrists and forearms an only told his swollen lower right forearm an stated "You have a nerve right there. I can not give you nothing for pain".

(196) Defendants Potter did nothing about the too-tight handrestraints. Defendant Johnson again refused to loosen the extremely too-tight bellychains that was causing pain an injuries to wrists.

(197) Defendants Potter and Brennaman refused to treat and record obvious injuries of Plaintiff's (an cell mates) wrists forearms an wrists. Nor did they perform a vital signs check.

(198) Around 9pm, Defendant Johnson came to do restraints check. And after he only touched the handrestraints, Plaintiff pleaded for him to loosen the left handrestraint because it would not move at all on left wrist.

(199) Defendant Johnson loosend the left one notch an refused to loosen bellychains, then he left the cell.

(200) At around 12 am, 8/3/10, shift changed Plaintiff does not know the name of Lieutenant who performed restraint checks for this shift. (Thus, at this time will be named Defendant John Doe # 4 )

(201) Defendant John Doe # 4 did nothing when Plaintiff (an cellmate) showed him the clearly visible extreme swelling of forearms, wrists; the abrasions an deep bruises, that the too-tight misapplied restraints caused intense pain.

(202) Defendant John Doe # 4 did nothing when Plaintiff told him that his right forearm, wrist, and fingers of hand was painfully numb. Each check Doe went in this fashion on his shift.

(203) No Health Services staff did a restraints check between the times of 12 am on 7 am of 8/3/10.

(204) At around 6 am, 8/3/10, shift changed, and Defendant Mattingly came on did restraints check. He only touched the hand restraints. He seen the clearly visible extremely swollen, inflammed and bruised wrists and forearms of Plaintiff (an cellmate) from too-tight restraints and did nothing.

(205) Defendant Mattingly told Plaintiff that he do not loosen belly chains.

(206) Plaintiff asked Defendant Mattingly how long will he (an cellmate) be in hand ambulatory restraints and Defendant Mattingly responded "I will make some phone calls to see what is going on", And left the cell.

(207) At around 8 am, Defendant Mattingly and Health Services Defendant Walls did restraints check. Plaintiff told Defendant Walls that his right forearm, wrist and 3-digits of hand was painfully numb.

(208) Plaintiff (an cellmate) displayed their painful swollen, inflammed, bruised wrists and forearms and too-tight restraints and Defendants Mattingly and Walls did nothing.

(209) Defendants Walls and Mattingly only touched the hand restraints. Defendant Walls did not examine, treat, or record easily seen clear injuries of wrists, forearms an wrists. Nor did he perform a vital signs check.

- 25 -

(210) Defendant Mattingly only stated," Word on the block is that ya'll assaulted an Officer", And left the cell.

(211) At about 9:20 am, Plaintiff seen Health Services Defendant Manna (who was then assigned as D-Unit's Physician Assistant) and told him that his right index forearm, wrist, and 3-digits of hand was painfully numb.

(212) Plaintiff also displayed the extremely too-tight restraints on his swollen, inflammed bruised and painful wrists an forearms, along with the easily seen too-tight misapplied belly-chain.

(213) Defendant Manna only stated," I can't do anything about it", And walked off.

(214) At around 9:30 am, Plaintiff seen Health Services Administrator Defendant Brода making rounds and displayed the injuries of bruised lacerated-hands an wrists an skin trauma to back of hand (all of which was sustained from the Incident of which he[for cellmate] was falsely accused of assaulting Defendant Brodoe an that they were[currently] in hand-ambulatory restraints-for) and neder medically assessed an treat-ed for.

(215) Plaintiff then showed Defendant Broдa the extremely too-tight an misapp-lied hand-restraints an belly-chain. And showed him his clearly visible swollen[painful] inflammed deeply bruised an abrasioned wrists, an fore-arms an backs.

(216) Plaintiff told Defendant Broдa that his right index forearm, wrist, and 3-digits of hand was painfully numb. Defendant Broдa only replied", There is qualified staff in medical to make sure that the restraints are not too-tight".

And hurriedly walked away.

(217) At around 10 am Defendant Mattingly did restraints check, the only touched the handrestraints and did nothing about them being too-tight or the injuries they caused, or were causing.

(218) Defendant Mattingly stated, "I will make some phone calls about releasing you from restraints". And left cell.

(219) At about 11 am, while recreation was being pulled on the range, Defendant Brodie came to the cell door and told Plaintiff (and cellmate), "When the Lieutenant makes his next round he will let ya'll out restraints. I bet yo's learned your lesson about talking stipid to me now huh?" And walked away smiling.

(220) At about 12 pm, Defendants Mattingly and Brodie came in cell. Both Defendants proceeded to take the leg-shackles and too-tight bellychain off Plaintiff (and cellmate), and after they left the cell the too-tight handrestraints was taken off.

(221) Plaintiff's skin was broken in some of the deep cuff indentions. Plaintiff also had deep bruises and abrasions on wrists, forearms, and torso. Plaintiff's wrists, forearms were extremely swollen, inflammed and blistering.

(222) Plaintiff's right lower forearm, wrist, and 3-digits of hand was partially absent and he felt intense fire-like painful sensations every time he used it or touched it. And Plaintiff's former injury to left wrist and hand was aggravated.

(223) Plaintiff (and cellmate) suffered 24 hrs in hard ambulatory restraints that was sadistically and injustishiously applied. The hard ambulatory restraints was inten-

-tionally misapplied and applied them extremely too-tightly.

(224) Plaintiff (and cellmate) was at no time; before application, during application, or during duration of being in hard ambulatory restraints; belligerent, aggressive or a security threat.

(225) On 12/2/11 at about 5:30pm, Defendant Parker provided falsified information on documentation falsely accusing Plaintiff of "threatening" and Plaintiff's cellmate of "threatening and attempt assault".

(226) Due to this falsified information and documentation Defendant Carrasquillo got authorization from Defendant Bledsoe to assemble a Calculated Use of Force Team to place Plaintiff (and cellmate) in hard ambulatory restraints

(227) At about 7pm, Defendant Carrasquillo ~~and his~~ arrived at Plaintiff's (and cellmate's)  *An Calculated Use of Force Team*  cell door. Defendant Carrasquillo lead Use of Force Team.

(228) The Calculated Use of Force Team consisted of the following Defendants: C. Anderson; R. Seagraves; K. Yakis, Recreation Specialist; M. Kline; B. Gadson; C. Frantz; M. Favrosi; J. Adamire and Officer Tighe (as Camera Operators) and Chaplain Janes (as Confrontational Avoidance Staff).

(229) Plaintiff (nor cellmate) Was never aggressive, combative, or a security threat to themselves or others. And Plaintiff (and cellmate) complied and submitted to handrestraints and was escorted by Use of Force Team out of cell on to shower area.

(230) Plaintiff was then stripped, searched, placed in see-through clothing without underwear, then placed in hard ambulatory restraints.

(230) The handrestraints and bellychain was knowingly an purposefully applied extremely an unnecessarily too-tight by Use Of Force Team Members. The handrestraints was so tight that they would not move at all on Plaintiff's Wrists. And the bellychain was so tight that it would not move on Plaintiff's Wrist and only forcefully threatened to pull handrestraints by forearms, eventhough they would not move.

(231) The too-tight handrestraints and bellychain caused Plaintiff immediate pain.

(232) The handrestraints was checked first by Defendant Carrasquillo, then Health Services Defendant Brennan. Both Defendants only touched the handrestraints an bellychain.

(233) Both Defendants; Carrasquillo and Brennan; seen the clearly obvious fact that the handrestraints and bellychain would not move at all along Plaintiff's Wrists an Wrist.

(234) Defendants; Carrasquillo and Brennan did nothing to correct this and only provided false information for the audio of Use of Force Camera When they stated; "The restraints are alright and don't interfere with circulation".

(235) No other part of restraints was checked.

(236) Defendant Brennan did not examine nor perform a vital signs check on Plaintiff.

(237) The Use Of Force Cameras was never in the proper position nor area to visually recored the step by step application of hand and ambulatory restraints, nor the deception perpetrated by Defendants Carrasquillo and Brennan.

(238) The Use of Force Cameras was never in the proper position to visually record the restraints Sgt. Dove on Rainville after application.

(239) Rainville's cellmate was also stripped, searched, placed in see-through clothing without underwear, and then placed in hard ambulatory restraints.

(240) Rainville (an cellmate) was then escorted by the Calculated Use of Force Team to the first floor of D-Unit to cell #103. The cell contained two beds and Rainville was forced to sleep, sit, etc. on the floor on a mattress because the hard ambulatory restraints do not allow him the movement necessary to get up on down on top bunk safely.

(241) Rainville clearly and easily seen that his cellmate's handrestraints on bellychain was extremely too-tight and would not move along his wrists on wrist and that he was in pain because of them.

(242) Rainville was unable to make without the extremely too-tight restraints causing him more pain, and Rainville's (an cellmate's) wrists on forearms started swelling within minutes.

(243) At around 9pm, Defendant Carrangillo performed the first restraints check, and Rainville (an cellmate) displayed the easily seen extremely too-tight restraints and the clear obvious swelling an inflammation they caused and that they would not move on wrists and wrists.

(244) Rainville (an cellmate) complained about an expressed the intense pain the too-tight handrestraints on bellychains caused. And Defendant Carrangillo only grabbed Rainville's (an cellmate's) handrestraints an stated, "Yeah, they are tight, but you are alright."

~30~

(246) Defendant Carrasquillo did nothing about the obvious an easily seen extremely too-tight handrestraints on bellychain, and the injuries an intense pain they caused.

(247) Plaintiff asked Defendant Carrasquillo why was he (an cellmate) in restraints and Defendant Carrasquillo stated "you will get the Incident Reports soon, but basically you threatened staff, attempted to assault staff, an refused an order".

(248) Plaintiff's cellmate explained that Plaintiff did not refuse an order nor attempt to assault nor threatened staff.

(249) Defendant Carrasquillo told Plaintiff, "It seems you are only guilty by association so I'll think about loosening your restraints". And then left the cell.

(250) Around 10pm, Defendant Carrasquillo did restraints check. Plaintiff (an cellmate) told Defendant Carrasquillo that restraints were extremely too-tight an causing excruciating pain,

(251) Plaintiff showed Defendant Carrasquillo the easily seen swollen, inflammed bruised wrists an forearms and that the restraints could not move an wrists, forearms an hands, and could not allow the movement necessary to drink water, or use the bathroom (urinate).

(252) Plaintiff also told Defendant Carrasquillo that he was already suffering from nerve injuries in his right wrist an forearm, and an unknown injury at left hand an wrist.

(253) Defendant Carrasquillo stated, "Yeah, I did tell you that I would loosen the hand-restraints for you since you really aren't suppose to be in them". And told the Officer with him to loosen each of Plaintiff's cuffs "one notch". The Officer did exac-

— 31 —



they that.

(254) There was no significant relief at all because the handrestraints was extremely too-tight from the initial application and Plaintiff's wrists an forearms was immensely swollen, inflammed, an bruised. ~~[illegible]~~ Plaintiff told an showed Defendant Corrasquillo this fact and he did nothing.

(255) Defendant Corrasquillo outright refused to loosen Plaintiff's cellmates handrestraints even tho his wrists forearms were extremely swollen an inflammed, the ~~[illegible]~~restraints would not ride at all on wrists or wrist and that they were causing him pain an would not allow the movement necessary to ~~[illegible]~~ eat, drink or use the bathroom (urinate).

(256) Defendant Corrasquillo ~~[illegible]~~ left the cell.

(257) Shift changed around 12 am. 11/2/11, and Defendant Sedoa and Health Services Defendant Brennapuan came to do restraints check, And was told on by Plaintiff (an cellmate) that the restraints was too-tight and caused excruciating pain an injuries.

(258) Plaintiff (an cellmate) displayed their easily visible swollen, inflammed, bruised forearms an wrists, and that the handrestraints nor bothychain would not ride at all on wrists, forearms, an wrist to Defendants Sedoa and Brennapuan.

(259) Defendants Brennapuan and Sedoa only grabbed the handrestraints and did nothing about their extreme tightness. Defendant Sedoa told cellmate, "I might loosen ~~[illegible]~~ the handrestraints depending on how I feel on my next check."

(260) Defendant Brennapuan did not record, treat, or examine Plaintiff's (an cellmate) ~~[illegible]~~complaints of pain, soreness, and clearly visible injuries. Nor did he perf-

- run a vital signs check.

(261) At about 2 am Defendant Seeba came to do restraints check and only walked in cell or looked around, not even attempting to touch restraints until Plaintiff's cellmate pleaded for the restraints to be loosened.

(262) Defendant Seeba finally decided to loosen cellmate's ~~hand restraints~~ hand restraints and stated "If you cry about them being too tight then you should not be in them. A little swelling never hurt nobody".

(263) Defendant Seeba only loosened the hand restraints one-notch and stated "That's all you get". Defendant Seeba outright refused to loosen Plaintiff's too-tight hand restraints. No other parts of restraints were checked.

(264) Plaintiff do not recall being seen ~~by~~ by a Health Services staff through the hours of 1 am — 6 am 1/22/11.

(265) ~~Plaintiff~~ Defendant Seeba came to do a restraints check at 2 am. Defendant Galletta came to check restraints at about 4 am. And Defendant Seeba came again around 6 am

(266) On each of these checks Plaintiff (and cellmate) complained about and displayed the extremely too-tight hand restraints on bellychain and the pain and visible injuries they caused. Defendants Seeba and Galletta did nothing.

(267) Around 6:45 am 1/22/11, breakfast of a sandwich was given to Plaintiff (and cellmate). Plaintiff (and cellmate) was unable to eat because the extremely too-tight hand-

-restraints and bellychain would not allow the movement necessary.

(268) The extremely too-tight handrestraints on bellychain would not allow the movement necessary to drink water, and only barely allowed the movement necessary to use bathroom (urinate), with much difficulty. A bowel movement was impossible.

(269) Shift changed, and at about 8 am, Defendant Mattingly, along with Health Services Defendant Walls came to do restraints check. Defendants Walls and Mattingly only touched the handrestraints.

(270) Defendants Walls did nothing about Plaintiff's (on cellmates) visible immensely swollen, inflamed, and deeply bruised wrists on forearms, and that the bellychain and hand-restraints would not move at all on wrists, forearms, on wrists.

(271) Defendants Mattingly and Walls did nothing when told about the excruciating pain they caused and that the too-tight restraints would not allow the movement necessary to eat, and drink.

(272) Defendant Walls did not examine, treat, or record Plaintiff's (on cellmates) complaints on visibly seen injuries. Nor did he perform a vital signs check.

(273) Defendant Mattingly asked what they were in restraints for and Plaintiff (on cellmates) explained. Defendant Mattingly stated, "I know Officer Parker, I'll talk to him and see what happened on when I come back I might loosen the restraints, or let y'all out of them." Defendants Mattingly and Walls then left cell.

(274) At about 11 am, Defendant Mattingly, along with Health Services Defendant George came to do restraints check, and Defendant George only touched handres-traints.

(275) Defendant George did nothing about the clearly visible immensely swollen, inflamm-ed and deeply bruised wrists, on forearms, and that bellychain on hand restraints could not ride on wrists, forearms, and wrists.

(276) Plaintiff told an showed Defendant George that the extremely too-tight hand rest-raints on bellychain could not allow the movement necessary to eat or drink and Defendant George responded, "Talk to Lieutenant Mattingly."

(277) Defendant George did not perform any vital signs checks. Nor did he examine, treat or record Plaintiff's (an cellmate's) injuries, pain, and complaints.

(278) Defendant Mattingly stated, "You know, I was thinking about releasing you two, or atleast loosening the restraints till I went an talked to c/o (correctio-nal Officer) Packer and basically his story was different from yours. My staff don't lie, so since you wished not to tell the truth you can stay in restraints." And he and Defendant George left the cell.

(279) About 10:45 am, lunch (each meal) was given to Plaintiff (an cellmate). And ag-ain, Plaintiff (an cellmate) was unable to eat because the extremely too-tight restraints could not allow the movement necessary.

(280) At about 12 pm, Defendant Mattingly along with Health Services Defendant Walls came to do restraints check. Both Defendants only walked inside cell looked arou-nd and left cell.

(281) Plaintiff's (an cellmate's) complaints of ~~pain~~ intense pain along with clearly visible injuries on too-tight restraints was not recorded, treated, examined or corrected. And Defendant Walls did not perform a vital signs check.

(282) Defendants Mattingly and ~~Smith~~ & Watts did nothing and left the cell.

(283) Defendant Mattingly ~~had~~ came to do his last restraints check for the shift at around 2pm. He walked in the cell, stood in one spot, looked around then left cell.

(284) At around 4pm, Defendant Seeba and Health Services Defendant George came to do restraints check. Neither Defendant did anything about the restraints being extremely too-tight, or the clearly visible injuries on on Sean Watts, forearms and wrists.

(285) Defendant George refused to examine, treat, or ~~even~~ record the visible injuries, pain (hunger or thirst) or on abrasions. Nor did he perform a vital signs check.

(286) Defendant Seeba ~~stated~~ "Yes okay", And both Defendants left cell.

(287) At about 4:30pm, Plaintiff (an cellmate) was ~~re~~ given dinner (self-meats) and again was not able to eat or drink because the extremely too-tight restraints would not allow the movement necessary.

(288) At about 6pm, Defendants Seeba an George came to do restraints check. The check went similar to ~~their~~ previous checks. Neither Defendant loosened the ties-be too tight restraints. Neither ~~Defendant~~ recorded complaints of thirst, hunger, or intense pain or injuries.

(289) Defendant George refused to examine, treat, or record Plaintiff's complaints, clearly visible injuries or pain. Nor did he perform a ~~medical~~ Vital signs check.

(290) At around 8pm, Defendant Seeba came to do restraints check. He only came

inside cell and looked around. He did nothing about the pain, injuries, and extremely too-tight restraints.

(291) A little while later, Plaintiff heard Defendant Carrasquillo on the range and called him to the cell door and asked, "Why are we still in restraints?", And Defendant Carrasquillo responded "I was going to let you out of restraints when I came on shift today, but you must have pissed someone off higher up because I was told by the Caption to not to let you out especially." And walked off.

(292) At around 1opm Defendant Seeba came (accompanied by Officer Frantz and another Officer). Defendant Seeba did nothing during about the extremely too-tight restraints, the injuries or pain they caused eventhough the injuries was easily or clearly seen. And that the too-tight restraints would not allow Plaintiff (or cellmate) the movement necessary to eat or drink.   for restraints check

(293) Officer Frantz came in an looked at all the bags of each meals on the desk, and started collecting them.

(294) Plaintiff (or cellmate) asked what he was doing with their food and Officer Frantz stated "I'm throwing them away."

(295) Plaintiff told Defendant Seeba that that was their food and that they haven't been able to able to eat and Defendant Seeba stated "It's six bags of food on the table, you are suppose to eat the food when it's passed out to you. If you save it it's considered contraband an we can throw it away."

(296) Plaintiff (or cellmate) again told Defendant Seeba that they have not been able to eat or drink anything since being in restraints because they are extremely too-tight an do not allow the movement necessary to perform these tasks.

(297) Plaintiff (an cellmate) again told an displayed to Defendant Seeba that the restraints are extremely too tight, don't make, have an is causing injuries an intense excruciating pain. And that Plaintiff (an cellmate) is hungry an thirsty.

(298) Defendant Seeba only shrugged his shoulders an stated", Thats not my problem, as one told you an ya'll to be in restraints". And Officer Trantz continued to collect the bags an took them out of the cell an threw them away, then Defendant Seeba an the other Officer left the cell.

(299) Shift changed at 12 am 1/23/11, and around this time Lieutenant Winter came to do a restraints check, Before ~~Plaintiff could~~ Plaintiff could say anything Lt. Winter asked "Are ya'll alright?" As he looked at the restraints an wrists.

(300) Plaintiff told Lt. Winter that he and cellmate San in excruciating pain, that they haden't been able to eat or drink because the restraints are so tight they don't allow the movement.

(301) Lt. Winter stated "Hold on, I just came on shift, let me finish making my rounds and when I come back I'll let ya'll out of restraints an put ya'll back in ya'll cell". As Lt. Winter left the cell Plaintiff heard him tell the D-Unit Officers "Get their cell an property ready because I will be letting them out when I come back".

(302) At about 2am, Lt. Winter came to do restraints check, an in the process released Plaintiff (and cellmate) from hard ambulatory restraints. Lt. Winter escorted Plaintiff (an cellmate) to their ~~new~~ cell, gave them their personal property, and told them to talk to Medical in the morning about the injuries of their wrists, forearms, and wrists.

(303) Plaintiff (an cellmate) was unjustifiably placed an keep in hard ambulatory restraints

-38-

For an injustified prolonged period of 30 hrs. The bellychains and handrestraints & hard-ambulatory restraints was intentionally applied and left extremely too-tight for the prolonged period. P.A. Hemphill told Plaintiff "you are on medicine" when he told an showed injuries an pain on 1/24/11.

(304) The extreme tightness & handrestraints an bellychains would not allow Plaint-iff the indenent necessary to eat or drink water for the entire period.

(305) Plaintiff (an cellmate) was at no time aggressive, belligerant nor a security threat to themselves or others, but at all times compliant and undera control (before, during, and while in hard ambulatory restraints).

## CLAIMS FOR RELIEF

(306) In all an each of the abovementioned events concerning the Calculated Use & Force Team Members, all the following Defendants; G. Edinger, B. Sert, E. Good, S. Hicks, F. Klinefelter, S. Pitzman, K. Whittaker, J. Lesho, R. Loss, S. Booth, G. Wise, Z. Edinger, L. Anderson, R. Seagraves, K. Yohe, M. Kline, B. Barton, C. Frantz, M. Farrow &. (i.e. other Correction-nal staff who participate as a Use & Force Team Member); did misuse force and used excessive use of force when they acted in collusive concert to willfully, purp-osely, an maliciously misapply and apply extremely an unnecessarily too-tight the handrestra-ints an bellychains & hard ambulatory restraints.

(307) This method of intentionally, an purposelly, an knowingly misapplying and applying extremely an unnecessarily too-tightly the hard ambulatory restraints is a common custom an practice maliciously used here at USP Lewisburg by all staff that participate on the Calculated Use & Force Team specifically an soley to punish, hurt, an intimidate Plaintiff (an Prisoners).

(308) In each and all of the above abovementioned events, the following Defendants; F. Sbart, J. Harper, W. McFadden, A. Sassman, P. Carrasquillo, T. Johnson,

M. Saylors, J. Seeba, C. Mattingly, A. Galletta, John Doe #4, (et al) were all Lieutenants.

(309) Lieutenants are above Correctional staff in the chain of command an thus has direct supervision of them. In addition, Lieutenants also lead an supervise the Calculated Use of Force Team when they have gotten approval ~~████████~~ ~~████~~ to assemble them an ~~for~~ apply hard ambulatory restraints.

(310) In the events aforementioned Defendants Stuart and Carrasquillo lead and supervised the Calculated Use of Force Team an application of Restraints. Both Defendants had a duty to ensure that the minimal amount of Force was used on Plaintiff, an to ensure that the hard ambulatory restraints were applied correctly an properly.

(311) Defendants Stuart an Carrasquillo did Willfully an maliciously act in concert an collu-sion with Use of Force Team Members by ~~██████████~~ _acquiescing in_ an/for condoning the intentionally malicious misapplication an extreme tightness of hard ambulatory restraints by Use of Force Team Members.

(312) Defendants; Stuart an Carrasquillo; had the duty an authorization to loosen an corr--ect the misapplied, an too-tight restraints at initial application but refused to and instead provided falsified verbal statements for benefit of audio of Use of Force Camera.

(313) The special an collusive conduct of Defendants; Stuart an Carrasquillo; acquiescing in and/or condoning the misapplication, and extreme tightness of hard ambulatory restraints is a common custom an practice of all Lieutenants here at USP Lewis--brg.

(314) Defendant Stuart specially authorized the episode of excessive an misuse of force towards Plaintiff when he, for no reason, yelled, "Stop Resisting", and had the entire Use of force Team pile up on Plaintiff an pull on twist his limbs in different directions.

(315) This is another method that is a common practice an custom that is maliciously used in order to use excessive an unnecessary force on Prisoners at USP Lewisburg.

(316) In each an all of the events aforementioned, the ~~Plaintiff~~ following Defendants; ~~Stuart~~, Hooper, McFadden, Sassman, Carrasquillo, Johnson, Saylors, John Doe #4, Seeba, Mattingly an Galletta; all had authority an Duty, with numerous opportunities to release ~~Prisoners~~ from hard ambulatory restraints or ordering lesser restraints when ~~Prisoners~~ displayed a pattern of self-control an compliance.

(317) These same Defendants refused to adequately loosen an correct the misapplied an too-tight hand restraints an belly chains on Plaintiff on numerous occasions.

(318) These same Defendants intentionally an maliciously acted in collusive concert when they continuously falsified documentation; (i.e. remarks an statements in Lieutenant 2 hour Restraints Check Log) stating that Plaintiff was belligerent, an aggressive, in order to keep him in restraints.

(319) This method of collusively an willfully falsifying documentation in the ~~Lieuten-~~ Lieutenant 2 hour Restraints Check Log is a specious common practice an custom of the above Defendants (an all Lieutenants) here at USP Lewisburg to keep Prisoners ~~in~~ in hard ambulatory restraints after the Prisoners are under self-control and compliant.

(320) Each Defendant: E. Stuart, T. Hooper, W. McFadden, A. Sassman, P. Carrasquillo,

T. Johnson, M. Saylors, J. Seeba, C. Mattingly, A. Galletta, ~~and~~ John Doe #4, (et. al, ie. all lieutenants); was aware of the substantial risks of serious harm by maliciously an colbisibly placing an keeping Prisoners (Plaintiff) in hard ambulatory restraints that are misapplied an applied extremely too-tight for prolonged periods.

(321) Each Defendant; Stahts, Hooper, Mc Fadden, Sassman, Carvergills, Johnson, Saylors, Seeba, Mattingly, Galletta, John Doe #4 (et. al, ie all lieutenants); disregarded those risks by refusing to, an failing to take reasonable measures to abate them.

(322) In each an all of the aforementioned events of the application of hard ambulatory restraints, the following Defendants; E. Kilpatrick, C. Webb, M. Wagner, ~~████~~, R. Admire, S. Tiglo, et. al (ie. Other staff who also participate as Camera Operators) was a part of the Calculated Use of Force Team in the capacity of Camera Operators.

(323) These Defendants; Kilpatrick, Webb, Wagner, Admire, Tiglo (et. al); did Willfully an purposefully act in colbisible concert along with the Calculated Use of Force Team by failing to, an refusing to, properly Visibly record the actual step by step application of hard ambulatory restraints. And by refusing, an failing, to properly Visibly record the Up close step by step application they knowingly concealed the malicious misuse an excessive use of force by Use of Force Team Members, an thus the were deliberately indifferent.

(324) These Willfull colbisive actions an deliberate indifference of Defendants; Kilpatrick, Webb, Wagner, Admire, an Tiglo; is a common custom an practice of all staff Members here at ~~██~~ USP Lewisburg who Are assigned the position of Use of Force Camera Operator.

(325) In each and every event concerning a Calculated Use Of Force, there is a Staff Member in the position Of Confrontational Avoidance, whose job is to ~~try~~ attempt to gain the Prisoner's cooperation before force is used, in order to avoid force an application of restraints.

(326) In the aforementioned events concerning the Calculated Use Of Force Teams, the following Defendants; M. Keeles, H. Birdsall, and M. Jones (et al ie other staff who act as Confrontational Avoidance); were assigned as Confrontational Avoidance.

(327) In each Of the aforementioned events, the Confrontational Avoidance techniques used by Defendants; Keeles, Birdsall, and Jones; was succesful in gaining Plaintiff's cooperation, as he Voluntarily Submitted to hand restraints. Despite this fact, force was still unnecessarily used against an towards Plaintiff in the form Of him being placed in hand ambulatory restraints (that were misapplied and extremely too-tight), and left in them for prolonged periods Of time Unjustifiable.

(328) Defendants; Keeles, Birdsall, and Jones; all were deliberately indifferent when they failed and refused to intervene to stop the misuse Of, an excessive force used towards an against Plaintiff after confrontational avoidance proved successful an Plaintiff Voluntarily ~~complied~~ cooperated. This deliberate indifference displayed by these Defendants is a common custom an practice among ~~all~~ staff that act as Confrontational Avoidance staff here at USP Lewisburg.

(329) In two Of the aforementioned events, the following Defendants; Broskie an K. Packer; did Willfully an intentionally provide falsified documentation an information accusing Plaintiff Of misconduct solely to hurt them an get them punished by getting them placed in hand ambulatory restraints (that are always misapplied and applied too tightly) for Unjustified prolonged periods.

(330) Defendants; Brodse, Packer, et. al. (i.e. all USP Lewisburg Staff) know that certain allegations against Prisoners will *automatically* get them placed in these types of restraints, an this, fal-sify documentation an information maliciously an arbitrarily, and by doing so are the initial causation of the collusive misuse an excessive use of force. This species malicious collusive conduct of Defendants is a common practice an custom among staff here at USP Lewisburg.

(331) In each an all of the above aforementioned events stated, the following Defendants; Haney, John Does #1, #2, #3, and Drick, and Tanner; were all Correctional staff an was assigned to Z-Unit or D-Unit where Plaintiff was placed after being placed in hard ambulatory restraints.

(332) In the above aforementioned events where they are mentioned, Defendants; Haney, John Does #1, #2, #3, Drick and Tanner; were not only callously indifferent to Plaintiff's obvious pain, need for medical attention, and need for extremely too-tight an misapplied restraints loosened, but also threated him.

(333) This display of callous indifference is also a conduct that is a common practice an custom among correctional staff here at USP Lewisburg towards Prisoners that are placed in hard ambulatory restraints.

DENIAL AND/OR DELAY OF ADEQUATE MEDICAL CARE

(334) In the above aforementioned events the following Defendants; D. DeLeon, W. Brennaman, B. Prince, G. George, B. Watts, L. Potter, M. Peoria; were Health Services Staff.

(335) Defendants; DeLeon, Potter, and Brennaman; did callously an deliberately disrega-rded the risk of serious harm Plaintiff faced by being in hard ambulatory restraints that was purposefully misapplied and applied extremely too-tight when they willfu-lly an callously falsified statements (an documentation) that restraints" did not interfe-r with circulation an was proper", on each every application.

-44-

(336) Defendants; Potter, Brenneman, Wells, Prince, Peoria, an George; was collodly an deliberately indifferent to Plaintiff's ~~complaints~~ medical needs (i.e. complaints, pain, an serious injuries) during all the Medical Restraints Checks (an/or other occasions ~~~~ a-forementioned).

(337) Defendants; Potter, Brenneman, Wells, Prince, Peoria, an George; all collosidely falsified information an documentation in Plaintiff's Medical Records by continously stating that during the restraints checks Plaintiff did not complain of being in pain, an that he had no injuries, along with other falsified information, soley to conceal the injuries an pain from the ~~the~~ misuse an ~~~~ excessive Use of force.

(338) Defendants; Potter, Brenneman, Wells, Peoria, Prince, George et. al (i.e. other ~~~~ Health Services Staff) willingly an collosidely participate in this practice an common custom of collods indifference, here at USP Lewisburg, towards Prisoners' pain, injuries an medical needs who are in, an has been, in the misapplied an extremely too-tight hard ambulatory restraints.

(339) Each Defendant; Potter, Brenneman, Wells, Peoria, Prince, George; was aware that Prisoners (Plaintiff) face a substantial risk of serious harm by being, ~~~~ denied treatment an being in ~~~~ misapplied and extremely too-tight hard ambulatory restraints. And each Individual disregarded that risk by failing an refusing to take reasonable measures to abate it.

(340) In each of the aforementioned events, the following Defendants: I. Navarro, an J. Nava's [and Hemphill] were Health Services Staff with the title of Physician Assistance (P.A.) and was assigned to D-Unit (although at different times).

(341) Defendant Navarro was collodly ~~~~ an deliberately indifferent to Plaintiff's health by failing an refusing to provide adequate medical care an treat for injuries caused by, an suffered from misapplied, an extremely too-tight

- 45 -

hard ambulatory restraints on 2/25/10 through 2/26/10.

(342) Defendant Navarro displayed specious callous conduct and was callously and deliberately indifferent to Plaintiff's medical needs an treatment when he purposebelly an ~~willfully~~ refused to record an document Plaintiff's numerous sick-call slips an cop-outs in his medical records and instead recorded falsified information, documentarion, diagnosis etc to hide an conceal facts of Plaintiff's injuries an condation.

(343) Defendant Navarro never examined Plaintiff.

(344) Defendant Atama was deliberately indifferent to Plaintiff's medical needs when he ~~intimately~~ callously followed on repeated Defendant Navarro's falsified information an diagnosis (for the injuries ~~Plaintiff~~ caused by an inflicted from misapplied, an extremely too-tight hard ambulatory restraints on 8/2/10 through 8/3/10) even when medical evidence proved differents.

(345) Defendant Hemphill was deliberately indifferent on 1/24/11 ~~deliberately indifferent~~ to Plaintiff's medical needs when he only told him "You are already on pain medicine." when he was told and ~~shown~~ showed the visible bruises, abrasions, an swelling upon an around Plaintiff's wrists and forearms. Defendant Hemphill did not examine Plaintiff.

(346) This callous deliberate indifference ~~day~~ to Plaintiff's medical needs an care by Defendants; Navarro, Atama, and Hemphill; by specious callous methods, delay, and outright refusal of medical care is a common custom aus practice among Physician Assistances & Health Services here at USP Lewisburg towards Prisoners who ~~also~~ need an attempt to receive adequate medical care an treatment from pain an injuries from being victims of misuse of force an excessive Use of force (i.e. misapplied and too-tight hard ambulatory restraints.

SUPERVISOR   LIABILITY

(347) Defendant S. Brown is the Health Services Administrator here at USP Lewisburg, and is responsible to have competent medical staff that will render adequate medical care an treatment to Prisoners an follow procedures.

(348) Defendant Brown ~~[redacted]~~ has been, an continue to be put on notice of his staff's ~~ongoing~~ ongoing refusals to provide adequate medical care an treatment to Plaintiff (& al, ie Prisoners) Via administrative Remedies, Verbal complaints, and Plaintiff's display of his obvious/visible physical injuries on 8/3/10 (while Plaintiff was in misapplied an ~~[redacted]~~ too-tight hard ambulatory restraints.

(349) Defendant ~~[redacted]~~ Brown failed an refused to adequately investigate Plaintiff's complaints an grievances of ~~[redacted]~~ denial / inadequate medical care an treatment He was aware that Plaintiff was not receiving adequate medical care an had a duty to ensure that Plaintiff did, but failed to do so.

(350) Defendant Brown was aware that Plaintiff faced a substantial risk of serious harm due to the misapplied an too-tight hard ambulatory restraints an his serious medical needs (ie injuries an pain caused by them).

(351) Defendant B.A. Bledsoe is the Warden here at USP Lewisburg, and is responsible for the overall safety an health of all Prisoners here. He is also responsible for the daily operations an running of USP Lewisburg, as well as responsible for the hiring an training of all Employees at the Prison.

(352) Defendant Bledsoe had a duty to adequately train employees in confrontational avoidance, calculated use of force, and application of ~~[redacted]~~ restraints in accordance with rules an regulations. Defendant Bledsoe had a duty to ensure that all employees adhere to an abide by those rules an regulations, an failed to do so.

(353) Defendant Bledsoe has been, an continue to be put on have; via cop-outs, personally, Administrative Remedies, an other substantial evidence, etc.; of staff continuously repeatedly, an maliciously falsifying (or providing) their notion an documentation, being excessive force an misusing force (i.e. applying extremely an unnecessarily too tight, and misapplying hard ambulatory restraints), and denying an delaying adequate medical care an treatment to (an on) Prisoners.

(354) Defendant Bledsoe continuously fail to adequately investigate the obvious callous malicious problem of staff's violations of providing falsified information an documentation, being excessive use of force, an misuse of force, and denying and/or delaying adequate medical care to (an against) Prisoners.

(355) Defendant Bledsoe continuously approve for Prisoners to be placed in hard ambulatory restraints. Also, Defendant Bledsoe continuously pre-approve for Prisoners to be left in them for ▓▓▓▓ ▓▓▓▓ unjustifiable prolonged periods.

(356) Defendant Bledsoe continuously disregard and ignore the violations an sadistic conduct displayed by staff during Calculated Use of Force and application of hard ambulatory restraints when he perform the After Action Review.

(357) Defendant Bledsoe was aware that Prisoners faced a substantial risk of serious harm due to being subjected to being ▓▓▓▓▓▓▓▓ placed in an left in hard ambulatory restraints that are misapplied and applied extremely too tight for prolonged periods of time. And for being denied an delayed adequate medical care for the injuries they cause.

(358) Defendant Bledsoe disregarded those risks by failing to take reasonable measures to abate them.

(359) Defendants; Bledsoe an Bradon; both authorized, acquiesced in and/or condoned the pro-

common

-48-

-dice an custom of ~~their~~ staff being deliberately indifferent to Prisoner's (Plaintiff's) right to ~~continued~~ adequate medical care.

(360) Defendant Bledsoe authorized, acquiesced in and/or condoned the common pra -dice an custom of violating Prisoners' (Plaintiff's) right to be free from excessive use of force, and misuse of force.

(361) Each and every Defendant of Complaint acted in conscious disregard of the known an substantial risks of harm from the aforemention violations, to Prisoners (Plaintiff). And each Defendants' conduct was willfull, wanton, malicious an intentional.

(362) As a direct an proximate result of all the Defendants' conduct an deliberate indiff -erence to, an violation of Plaintiff's constitutional Rights, as guaranteed by, amoung other things the Eighth Amendment; Plaintiff has deprived of his right to be free from excessive use of force an misuse of force, and his right to adequate medical care.

## INJURIES

(363) As a direct result of Defendants' actions and omissions, Plaintiff has suffered an contin -ues to suffer the following physical an mental injuries ~~...~~ including without lim -itation those stated therein:

(364) A ij painfull injury to left wrist and hand, which to this date Plaintiff does not know the full extent of his injuries associated with this particular injury. Plaintiff suffers from right superficial radial sensory neuropathy, and right median nuroneuropathy at or distal to the wrist, all painfull.

(365) Plaintiff has tried an continues to try several pain medications that have not work -ed to alleviate the pain an sensory disturbances of both hands an wrists.

(366) Plaintiff suffered acute cuts an deep bruises an abrasions; along an upon his lower forearms, wrists, and hands; consistent with cuff an chain edges, And also severe painful swelling an inflammation of both forearms an wrists an hands, excruciating pain.

(367) Plaintiff suffered dehydration, hunger; And also suffered an continues to suffer mental anguish an emotional distress.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

(368) Plaintiff has exhausted his administrative remedies with respect to all claims and Defendants.

## PRAYER FOR RELIEF

(369) Therefore, Plaintiff prays for judgement against Defendants, including a declaration that Defendants violated his constitutional rights, compensatory damages against each Defendant, jointly an severally, and punitive damages against each Defendant in an amount to be determined at trial, along with attorney fees, costs, and an injunction ordering an enjoining the Defendants, their successors in office, agents an employees and all other persons acting in concert an participation with them to:

A) Immediately cease an desist authorizing the use and implementation of the Calculated Use of force Team an placement in hand ambulatory restraints when the situation does ~~is~~ not further any real penological interest (i.e. when a safety an/or security threat never existed, or when an actual safety an/or security threat has passed, or no longer exists).

B) Immediately begin utilizing the Confrontation Avoidance Technique in actual an real attempts to avoid the use of the Calculated Use of force Technique an placement in hand ambulatory restraints.

C) Immediately begin utilizing soft restraints initially, whenever placement in ambulatory

-atory restraints is actually ~~one~~ necessary an justified to further an actual penologi-
-cal interest.

(D) Immediately begin actually visually recording (by close; via the use of force camera operator; the applications of each restraints as they are being applied, the initial restraints check by Medical staff an lieutenant, as well as the Prisoner (endorsir-ed) after application.

(E) Immediately cease an desist double celling Prisoners who are in hard ambulatory restraints in cells that contain bunk beds and only double cell them in cells that contain floor bunk.

(F) I immediately begin only placing Prisoners; who are in hard ambulatory restraints in cells that are equipped with a video camera, or that a video camera be utilized during every restraints check to record condSt of Prisoners and staff, an to ensure adequate medical care an checks are properly given an done.

And any other relief the Court deems necessary an proper.

I declare under penalty of perjury an under the laws of the United States that the foregoing statements are true an correct to the best of my knowledge

Executed: Aug 28, 2012 _____   Signature: _____

James A. Lucas # 08801-003

USP Lewisburg

Po Box 1000

Lewisburg, Pa 17837

Exhibit # 2

Declaration of James A Lucas (plaintiff)
And (3) attachments

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

- 1 -

| | | |
|---|---|---|
| JAMES A. LUCAS, Plaintiff | : | Civil No: 1:11-cv-2318 |
| v. | : | (Jones, J.) |
| B.A. BLEDSOE, et. al., Defendants | : | |

## DECLARATION OF JAMES A. LUCAS

I, James A. Lucas hereby state:

1. I am Pro-Se Plaintiff in the above case, and am a Prisoner incarcerated at the United States Penitentiary Lewisburg, Pennsylvania (USP Lewisburg). Plaintiff is in the Special Management Unit (SMU), where Prisoners are locked in their cells 24/7, other than the one hour recreation.

2. Attached is an accurate copy of Legal Materials Request Form, which are used here in order for said Prisoners to request legal materials and/or legal copies of documents.

3. Said Prisoners are to submit their legal requests via 'Institutional Mail'; i.e. sealing in envelope, addressing envelope 'Institutional Mail - 'Education Dept/Main Law Library'; and giving it in to Unit Staff (who places it with all other mail).

4. Plaintiff properly complied with process of legal requests, as well as Instructions #1 - #6 on Legal Materials Request Form when he submitted a request for copies (along with Original) of his Amended Complaint on Sunday, Aug 19, 2012, in order to get copies to send this Court and Defendants.

5. Plaintiff did not receive the copies requested nor his original back when Main Law Library staff, Mr. Goss, made his weekly rounds on Sunday, Aug 22, 2012.

-2-

6. Attached is the original of Inmate Request Form to Staff (Main Law Library) that Plaintiff submitted, frequently inquiring about his copies on his Original of Amended Complaint. Also attached is an accurate written copy of Inmate Request Form to Staff.

7. The Main Law Library claims to have never received Plaintiff's request, and no one knows where Plaintiff's legal documents are.

8. The losing and misplacement of legal documents submitted by USP Prisoners is not new, but infact, occurs often.

9. Plaintiff had to hastily re-write amended complaint to submit to this Court. And due to not being able to personally get to a copy machine, in fear of his original pertinent legal documents, evidence, etc being lost or misplaced by USP staff when copies are requested, Plaintiff is unable to submit copies to Defendants.

Pro se Plaintiff hereby state under penalty of perjury pursuant to the provisions of 28 USC 1746, that the above is true and correct to the best of his knowledge.

Date: Aug 28, 2012          Signatures: _____

                           James A. Cross # 08301-003

                           USP Lewisburg

                           PO Box 1000

                           Lewisburg, Pa 17837

# Legal Materials Request Form

**USP Lewisburg, PA**

Updated July 2012

**INSTRUCTIONS:**

1. Due to limited resources (such as time and manpower) and the amount of requests that the Library receives each week, please limit yourself to ONE (1) request per week with no more than THREE (3) items per request. This includes: Legal Copies, Addresses (if available) and/or any other legitimate LEGAL requests. When you have received your requested material(s), you may submit another request. Do not send multiple request forms, only one request will be honored per week, in the order that it is received.

2. Materials which are readily available on your unit's Electronic Law Library (ELL) computer will not be provided by the Main Law Library. To access, view and print those materials. To attend your unit's Law Library, you will need to submit a Request to a Staff Member (cop-out) to your unit's correctional staff. In the event that you are on indigent status (inmates lacking funds) and need items printed off of the ELL computer, you may request an Indigent Inmate Request for Printed Legal Pages form from the Main Law Library. Please read and carefully follow the directions on the form and complete the form in its entirety. Completed forms then must be sent to the Supervisor of Education for verification of indigent status.

3. When making your request, please state as specifically as possible, the item(s) for which you are requesting. (For Example: Four (4) copies of all legal materials, front and back.) Your request must be printed legibly and include your last name and full inmate number. Failure to comply with these procedures may result in your request not being filled. Additionally, all requests to the Main Law Library may be made using any of the following methods: A Legal Materials Request Form (this form), a standard Inmate Request Form (cop-out) or by writing your request on a blank sheet of paper, so long as it abides by the rules listed above. **Requests that are written on the envelope will not be honored and will be returned uncompleted.**

4. <u>FOR LEGAL COPIES:</u> You must state as clearly as possible the amount of legal copies that you require (i.e. 3 copies of each page, front and back). All fasteners (to include staples, tape, stickers, paper clips, etc.) must be removed from your legal paperwork prior to submission. Failure to comply will result in your legal items being returned to you uncompleted. Copies will only be reproduced on one side of standard 8½" x 11" copy paper and the Library will not honor any requests for enlargements and/or reductions of your legal materials. In order to help maintain acceptable levels of legal materials, there is a LIMIT OF 5 COPIES per page unless you can provide a written court mandated need for more.

5. <u>PRIOR TO RECEIVING YOUR LEGAL COPIES:</u> All inmates will be required to sign a pre-completed form BP-199.045 (Request for Withdrawal of Inmate Personal Funds) in the amount for which it cost to complete the copies. All copies cost $0.15 per page. When signing the form BP-199, **please provide your signature only** on the designate line. No political statements, nicknames or other written statements will be accepted. If you fail to abide by this rule, you <u>WILL NOT</u> receive your requested copies and an incident report may be written. Additionally, any inmate who **refuses to sign the form BP-199,** <u>WILL NOT</u> receive his requested copies and an incident report may also be written for your refusal to pay.

6. For further information, please consult your SMU handbook or see your unit's law library for a complete list of legal request rules and regulations (on the ELL computer, under the Local Documents section).

**ALL SUBMITTED REQUESTS ARE BASED ON THE COMPETETIVE NEEDS OF ALL INMATES AND SUBJECT TO THE NEEDS OF THE INSTITUTION.**

| Request # | Request (copy information, addresses, other) | Result |
|---|---|---|
| 1. | _____ | _____ |
| 2. | _____ | _____ |
| 3. | _____ | _____ |

Date Completed by Staff: _____

Cell #:

Register #:

NAME:

BP-S148.055   **INMATE REQUEST TO STAFF**   CDFRM          U.S. DEPARTMENT OF JUSTICE
SEP 98                                                     FEDERAL BUREAU OF PRISONS

| TO; (Name and title of staff member): Education Dept/Main Law Library, Mr. Gross | DATE: Aug 23, 2012 |
|---|---|
| FROM: James R. Lucas | REGISTRATION #: 08301-003 |
| WORK ASSIGNMENT: N/A | UNIT: B-110 |

SUBJECT:      (Briefly state your question or concern and the solution you are requesting. Continue on back, if
             necessary. Your failure to be specific may result in no action being taken. If necessary, you will be
             interviewed in order to successfully respond to your request.)

I am legally inquiring and requesting about the legal documents (labeled "Amen-ded Complaint") (about 55 pgs) that I sent via Institutional Mail to Main Law Library to get one copy of each. I did not recieve anything on Wensday Aug 22, 2012 when you did your rounds. I am in need of these documents because: ① They are the only copies I have, and ② more importantly, I have a deadline where I have to send it to the Courts before they grant judgment on the last motion (14) days... I know have (14) days from this date. Please, Please help! I sent it in via Institutional Mail Sunday Aug 19, 2012.

Thank You,

_(Continue on back if necessary)_

---

(Do not write below this line)

Disposition:   The Library did Not receive Any Legal items from you. Try contacting the mailroom.

Comp. 8/27/12
CH

| Signature of staff member: | Date: |
|---|---|

BP-S148.055   **INMATE REQUEST TO STAFF**  CDFRM     U.S. DEPARTMENT OF JUSTICE
SEP 98                                       FEDERAL BUREAU OF PRISONS

| TO; (Name and title of staff member): | DATE: |
|---|---|
| B-Unit 'OIC Shultz | Aug 26, 2012 |
| FROM: | REGISTRATION #: |
| James A. Lucas | 08301-003 |
| WORK ASSIGNMENT: | UNIT: |
| No | B-110 |

SUBJECT:     (Briefly state your question or concern and the solution you are requesting.  Continue on back, if
necessary.  Your failure to be specific may result in no action being taken.  If necessary, you will be
interviewed in order to successfully respond to your request.)

I am Urgently requesting for your assistance at your very earliest opportunity at
your busy schedule:

On Sunday Aug 19, 2012, I sent, Via Inmate transit Mail, a packet of important legal
Documents (about 55 pgs.) Titled "Amended Complaint") to the Main Law Library to
get one copy of each. When Mr. Gross made rounds Wens. Aug 22, 2012 I did not rec-
-eive anything. I am asking, Will you please, please, contact Mr. Gross and inquire
about it he found this packet of my legal Documents. This is highly important to me
because they are, needed to meet the deadline in the Court.

[Circle Paramount Note]

Thank you

(Continue on back if necessary)

---

(Do not write below this line)

Disposition:_____

_____

_____

_____

_____

_____

| Signature of staff member: | Date: |
|---|---|
| | |